IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **MARTIN QUINTANA**, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:13-CV-2505-L** |
| | § | |
| **FUJIFILM NORTH AMERICA CORP.,** | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant's Motion for Summary Judgment (Doc. 29), filed July 3, 2014. After considering the motion, response, reply, summary judgment evidence, record, and applicable law, the court **grants** Defendant's Motion for Summary Judgment.

## I.    Factual and Procedural Background

This is an employment discrimination case. Plaintiff Martin Quintana ("Quintana"), who was terminated in June 2012 as part of a reduction in force ("RIF") by his employer, FUJIFILM North America Corporation ("FNAC"), filed this lawsuit on May 22, 2013 against FNAC in the 14th Judicial District Court, Dallas County, Texas. On June 28, 2013, FNAC timely removed the action to this court based on diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). Quintana, a Hispanic male, alleges that FNAC unlawfully discriminated against him based on age, race, and national origin when it eliminated his position during the RIF, in violation of the Texas Commission on Human Rights Act ("TCHRA"), Texas Labor Code § 21.001 *et seq.*[1] Quintana also alleges that

---

[1] Texas abolished the Texas Commission on Human Rights in March 2004 and transferred its duties to the Texas Workforce Commission. The popular name for Chapter 21 of the Texas Labor Code, however, is the Texas Commission on Human Rights Act or TCHRA.

**Memorandum Opinion and Order - Page 1**

FNAC violated the TCHRA by retaliating against him for engaging in protected activity, and by subjecting him to harassment and a hostile work environment. Among other things, Quintana seeks compensatory and punitive damages, attorney's fees, and costs. The court now sets forth the evidence, viewed in the light most favorable to Quintana, as the nonmovant, and draws all reasonable inferences in his favor. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

A.      **Quintana's Employment with FNAC**

FNAC's Graphic Systems Division ("FNAC-GSD") markets graphic imaging equipment and related products and services. Def.'s App. 1. The Commercial Graphics unit of FNAC-GSD sells and services Fujifilm and non-Fujifilm products to commercial printers that have offset printing presses. *Id.* The Digital Solutions group, a part of the Commercial Graphics unit, is responsible for selling electronic imaging solutions and Xerox products to Commercial Graphic's customers. *Id.*

On or about January 23, 2006, FNAC hired forty-eight-year old Quintana, a Hispanic male and native of Cuba, to work in its Graphic Systems Division as a Digital Solutions Specialist, Sales ("DSS"). *Id.* at 2; Pl.'s App. 125.[2] As a DSS, Quintana's duties included selling digital press equipment, platesetters, workflow, and related products and services, as well as expanding FNAC-GSD's business base and cross-selling additional products and services to FNAC-GSD's existing customers. Def.'s App. 2. Quintana worked as a DSS for approximately six years. *Id.* at 3. He initially reported to Phil Kane, then-Vice President of Digital Sales. *Id.* at 2. Beginning in 2011, Quintana began reporting directly to his next-level manager, Ron Peterson ("Peterson"), National Director of Sales Solutions, a Caucasian male. Peterson, in turn, reported to John Sowold

---

[2] At the time Defendant hired Quintana, FNAC-GSD was a separate legal entity known as Enovation Graphic Systems, Inc.("Enovation"). In October 2006, Enovation was renamed FUJIFILM Graphic Systems, U.S.A., Inc., until it was merged into FNAC in 2010 as a division of FNAC. Def.'s App. 1.

("Sowold"), Vice President, Field Sales, a Caucasian male.  *Id.*  Sowold reported to Todd Zimmerman, Vice President & General Manager, also a Caucasian male.  *Id.*

Quintana generally worked remotely but was assigned to FNAC-GSD's Irving, Texas facility. *Id.*  Quintana twice earned top equipment sales representative, and performed in the top four or five in sales every year since he was hired.  Pl.'s App. 125.  Quintana performed above average by all standards compared to the sales team.  *Id.*

Peterson, who was Quintana's supervisor at the time of the RIF, supervised the Digital Solutions group, which consisted of twenty employees.  *Id.* at 83; Def.'s App. 35.  Of the twenty employees that  Peterson supervised, all were male, and the only two minorities were Quintana and Joe Galindo, who worked in the Los Angeles area and was also Hispanic.  Pl.'s App. 86, 126.  Other than Quintana, Robert Nordman ("Nordman"), a Caucasian male, was the only other employee who held the position of DSS reporting to Peterson in the Dallas area.  Def.'s App. 2.

**B.      Quintana's May 2, 2012 Conversation with Peterson**

On May 2, 2012, Quintana and Peterson met in Austin, Texas, to make multiple sales calls. Pl.'s App. 29.  While in Quintana's car, Peterson and Quintana had a conversation concerning diversity in the workplace that Quintana describes in his deposition as follows:

> Q.      Okay.  The context of the statement, can you tell me what you were talking about?
>
> A.      We were talking about the lack of diversity within our sales group.  Mr. Peterson stated that he had concerns about the lack of diversity.  His statement – and I quote – it looks like a bunch of graying old men, white

men, and he had, according to his statement at the time to me, had brought

it up to HR but they didn't seem too concerned about it.

* * *

Q.      And just so – how did you respond to him?

A.      It was incredible, and I may – you know, I may have said, you know, yeah,

there is a problem.  We were talking about it and there is a problem and

sometimes I feel harassment.

*Id.*   Quintana did not raise any concerns to the Human Resources Department following this

conversation, or at any time during his employment, about age, race, or national origin

discrimination.  Def.'s App. 4, 57, 105-06, 118, 121.

     **C.      FNAC's Anti-Harassment and Discrimination Policies**

During the relevant time period, FNAC maintained an Equal Employment Opportunity

Policy and an Anti-Harassment and Discrimination Policy, which, among other things, prohibited

discrimination in employment-related decisions on any unlawful basis, including age, race, and

national origin. *Id.* at 2, 5, 6-8.  FNAC's policies also prohibited retaliation, and provided that

anyone who engages in discrimination or retaliation will be subject to disciplinary action, including

termination from employment.  *Id.* at 3, 5, 8.  Additionally, FNAC's policies and standards included

procedures for an employee to report alleged violations of policies, including reporting suspected

violation to managers, the Human Resources Department, FUJIFILM Holdings America

Corporation's Compliance or Legal Department, or the Company Hotline via telephone or e-mail.

*Id.* at 4, 5, 8, 10. 25-26, 27.  Quintana received Company policies at the time of his hire.  *Id.* at 30,

51-52, 113.

### D.    The Workforce Reduction

Beginning in June 2012, as part of an effort to reduce costs and expenses during a decline in the graphic arts business and economy, and to reposition itself to remain in business, FNAC underwent a RIF affecting all of its Commercial Graphics group within the Graphic Systems Division. *Id.* at 3, 118, 120-21.   FNAC chose employees for the RIF based on their location, business function, duplicative or redundant job position and tenure.   *Id.*   In the Digital Solutions team, FNAC sought to eliminate sales positions in the two locations that were not top performers, namely, the Dallas area and the Los Angeles area.   FNAC determined that only one DSS was needed to support the existing sales volume and other duties in these two areas, and selected those DSS positions with the shortest tenure in the affected areas.   In the Dallas area, of the two DSS employees (Quintana and Nordman), Quintana had the shortest tenure (6.4 years versus Nordman's twenty years). *Id.* at 3, 53, 118, 121.   Similarly, in the Los Angeles area, FNAC selected the DSS with the shortest tenure for the RIF, Joe Galindo.   *Id.* at 3, 118, 121.   The DSS position held by Quintana was eliminated.   *Id.* at 118, 121. No employee was subsequently hired to fill his position.   *Id.*

Zimmerman and Sowold made the RIF selections, and did not consult with Peterson about Quintana's selection.   *Id.* at 3, 118, 121.   Peterson had no involvement in the RIF selection process. *Id.* at 118, 121.   Sowold and Zimmerman did not know Quintana's age, race, or national origin at the time they selection his DSS position as part of the RIF.   *Id.* at 118, 121.

On June 5, 2012, FNAC-GSD announced the RIF.   *Id.* at 3.   FNAC informed Quintana, and other affected employees, that the Company was eliminating their positions and that their employment would end on July 2, 2012.   *Id.*   FNAC ultimately terminated nine employees across the country in Commercial Graphics as part of the RIF.   *Id.* at 3, 120.   Within Peterson's Digital Solutions team, originally comprising twenty employees nationally, the RIF resulted in the

elimination of only Quintana's and Galindo's positions, leaving no minorities on the Digital Solutions team. Pl.'s App. 126. At the time of the RIF, Zimmerman was fifty-three years old, Sowold was fifty-seven years old, Plaintiff Quintana was fifty-four years old, and Nordman was fifty-one years old. Def.'s App. 2, 118, 121, 122.

### E. Quintana's Charge of Discrimination and Lawsuit

Quintana timely filed a charge of discrimination with the Texas Workforce Commission and the Equal Opportunity Employment Commission, alleging age, race, and national origin discrimination, as well as retaliation, harassment, and hostile work environment. *Id.* at 122-23. After receiving his right to sue notices, Quintana filed his Original Petition on May 22, 2013 in state court. Following timely removal to this court, on July 3, 2014, FNAC filed its motion for summary judgment as to all Quintana's claims. FNAC contends that Quintana cannot establish a prima facie case of discrimination or retaliation, and that, even if he has, he has not raised a genuine dispute of material fact that FNAC's legitimate, nondiscriminatory reason for terminating his employment was pretextual or retaliatory. FNAC also argues that it is entitled to summary judgment since Quintana presents no genuine dispute of material fact that FNAC was a hostile work environment. On July 14, 2014, Quintana filed his response to the motion for summary judgment, and on July 28, 2014, FNAC filed its reply in further support of its motion. FNAC's motion for summary judgment is ripe for adjudication.

## II. Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 323-25; *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a

reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587. (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136

F.3d at 458.   Rule 56 does not impose a duty on the court to "sift through the record in search of

evidence" to support the nonmovant's opposition to the motion for summary judgment.  *Id.*; *see also*

*Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992).   "Only disputes over

facts that might affect the outcome of the suit under the governing laws will properly preclude the

entry of summary judgment."  *Anderson*, 477 U.S. at 248.   Disputed fact issues that are "irrelevant

and unnecessary" will not be considered by a court in ruling on a summary judgment motion.  *Id.*

If the nonmoving party fails to make a showing sufficient to establish the existence of an element

essential to its case and on which it will bear the burden of proof at trial, summary judgment must

be granted.  *Celotex*, 477 U.S. at 322-23.

## III.     Analysis

### A.      Age, Race, and National Origin Discrimination Claims

Quintana brings his age, race, and national origin discrimination claims under the TCHRA,

Section 21.051 of the Texas Labor Code, which provides in relevant part: "An employer commits

an unlawful employment practice if because of race, color, disability, religion, sex, national origin,

or age the employer . . . discharges an individual, or discriminates in any other manner against an

individual in connection with compensation or the terms, conditions, or privileges of employment[.]"

Section 21.125(a) of the Texas Labor Code provides that:

> [A]n unlawful employment practice is established when the complainant
> demonstrates that race, color, sex, national origin, religion, age, or disability was a
> motivating factor for an employment practice, even if other factors also motivated
> the practice, unless [the protected characteristic] is combined with objective job-
> related factors to attain diversity in the employer's workforce.

The Texas Supreme Court recently noted the parallels between the TCHRA and federal anti-

discrimination statutes:

> Section 21.051 is effectively identical to Title VII, its federal equivalent, except that Title VII does not protect against age and disability discrimination. (Those forms of discrimination are addressed in separate statutes.)  Because one of the purposes of the TCHRA is to provide for the execution of the policies of Title VII of the Civil Rights Act of 1964, [the Texas Supreme Court has] consistently held that those analogous federal statutes and the cases interpreting them guide [the] reading of the TCHRA.

*Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012) (quoting *Mission Consol. Indep. School Dist. v. Garcia*, 372 S.W.3d 629, 633 (Tex. 2012) (internal quotation marks omitted)); *see also Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 492 (Tex. 1996) ("Because one purpose of the Commission on Human Rights Act is to bring Texas law in line with federal laws addressing discrimination, federal case law may be cited as authority.").

A plaintiff may prove employment discrimination with either direct or circumstantial evidence.  *See, e.g., Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005); *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citing *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir. 1994)).  Quintana purports to base his employment discrimination claims on direct and circumstantial evidence.

"Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption."  *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 n.3 (5th Cir. 2003) (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002) (internal quotation marks omitted)).   "In other words, to qualify as direct evidence of discrimination, an employer's comment 'must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was an impermissible factor in the decision to terminate the employee.'"  *Read v. BT Alex Brown Inc.*, 72 F. App'x 112, 119 (5th Cir. 2003) (quoting *EEOC v. Texas Instruments Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996)).  Remarks "relat[ing] to the protected class of persons of which the plaintiff is a member," near in time to

plaintiff's allegedly discriminatory termination, "made by an individual with authority" over the decision, and related to the decision may constitute direct evidence of discrimination. *Jackson v. Cal-Western Packing Corp.*, 602 F.3d 374, 380 (5th Cir. 2010). Direct evidence of discrimination is rare. *See, e.g., Rutherford v. Harris Cnty., Tex.*, 197 F.3d 173, 180 n.4 (5th Cir. 1999) (sex discrimination case) (stating that because direct evidence is rare in discrimination cases, a plaintiff must ordinarily rely on circumstantial evidence to satisfy her burden of persuasion). If a plaintiff provides direct evidence of discriminatory animus in the employment decision, the burden shifts to the defendant to prove "it would have taken the same action regardless of discriminatory animus." *Sanstad*, 309 F.3d at 896.

Where a plaintiff relies on circumstantial evidence, Texas courts apply the *McDonnell Douglas* burden-shifting framework to employment discrimination claims under the TCHRA. *Reed*, 701 F.3d at 439 (citing *Mission Consol.*, 372 S.W.3d at 633-64) (in turn citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) (establishing the three-part procedure for assessing a disparate treatment claim in the absence of direct evidence)).

As modified, *McDonnell Douglas* consists of three stages. First, the plaintiff must establish a prima facie case of discrimination, which creates the presumption that the defendant unlawfully discriminated against him. *Mission Consol.*, 372 S.W.3d at 633-64 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). "Although the precise elements of this showing will vary depending on the circumstances, the plaintiff's burden at this stage of the proceedings 'is not onerous.'" *Id.* (quoting *Burdine*, 450 U.S. at 253).

Second, once the plaintiff establishes a prima facie case, the defendant must set forth a legitimate, nondiscriminatory reason for the employment action it took against the plaintiff. *Machinchick*, 398 F.3d at 350. This is a burden of production, not persuasion, on the defendant's

part, and it "can involve no credibility assessment." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

Third, if the defendant meets its burden of production, "the burden shifts back to . . . plaintiff to make an ultimate showing of intentional discrimination." *Reed*, 701 F.3d at 439 (citing *Machinchick*, 398 F.3d at 350). Under the TCHRA, to demonstrate a genuine dispute of material fact that the defendant intentionally discriminated against him, a plaintiff may show "either (1) the reason stated by the employer was a pretext for discrimination, or (2) the defendant's reason, while true, was only one reason for its conduct and discrimination is another motivating factor ('mixed motive')." *Id.* at 439-40 (quoting *Michael v. City of Dallas*, 314 S.W.3d 687, 691 (Tex. App.—Dallas 2010, no writ)).[3]

"Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against plaintiff remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253).

### 1.    Direct Evidence

The court turns first to whether Quintana has direct evidence of discrimination. Quintana argues that he has produced direct evidence of age and race discrimination. Specifically, he contends that Peterson's May 2, 2012 comment to him that the sales group "looked like a bunch of graying old men, white men[,]" is "direct evidence of discrimination[.]" Pl.'s Summ. J. Resp. 16. The court disagrees.

---

[3] Under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, a plaintiff at this third stage of the *McDonnell Douglas* inquiry must prove that age was the "but for" cause of the challenged adverse employment action. *See Reed*, 701 F.3d at 440 (citations omitted). "Under the TCHRA, however, a plaintiff need only show that age was a 'motivating factor' in the defendant's decision." *Id.* (citations omitted). Because Quintana is solely alleging violations of the TCHRA, the ADEA's "but for" test is inapplicable.

A comment that the sales team is made up of "graying old men, white men[,]" in no way proves the fact of "discriminatory animus without inference or presumption." *Sandstad*, 309 F.3d at 897. With regard to age discrimination, the comment, if anything, suggests that FNAC-GSD favors older employees. Otherwise stated, such a comment would not "allow[] a reasonable jury to conclude without any inferences or presumptions that age was an impermissible factor in the decision to terminate the employee." *Texas Instruments*, 100 F.3d at 1181. Similarly, Peterson's comment about a lack of racial diversity does not show a discriminatory animus without inference or presumption. Even were such a benign comment somehow considered to reflect discriminatory animus, as Quintana argues, the court agrees with FNAC that Peterson's comment is a "stray remark" that is not evidence of discrimination. "[I]n order for comments in the workplace to provide sufficient evidence of discrimination, they must be '1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the [complained-of adverse employment decision]; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.'" *Rubinstein v. Administrators of the Tulane Educ. Fund*, 218 F.3d 392, 400-01 (5th Cir. 2000) (quoting *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996) (brackets in original)). Peterson's remark fails to meet this test. First, it is uncontroverted that Peterson had no authority over the employment decision at issue.[4] Second, Quintana has failed to present evidence, and the statement does not itself show, that Peterson's remark was in any way related to FNAC's decision to include Quintana's position in its RIF.

_____

[4] Quintana has produced no evidence that Peterson made any of the complained-of employment decisions. Although FNAC could be held liable if Peterson influenced the decisionmaking process, Quintana has not adduced any evidence that would permit a reasonable jury to make this finding. *See Siddiqui v. Autozone West, Inc.*, 731 F. Supp. 2d 639, 649 n.15 (N.D. Tex. 2010) (Fitzwater, C.J.) (and cases cited therein).

As further direct evidence, Quintana points to statistics, arguing that: "As a result of the RIF 100% of the minorities on the Peterson team, the 2 Hispanics, were fired, leaving the team totally without diversity. No further statistical evidence should be necessary." Pl.'s Summ. J. Resp. 10 (emphasis in original). Because such evidence would require an inference or presumption by the jury that race was the reason the two Hispanics were terminated, rather than lack of tenure and redundant job functions, it is not direct evidence of discrimination. *See Sandstad*, 309 F.3d at 897.

Finally, the court rejects Quintana's argument that "reliance on tenure as the lone factor for termination was discriminatory per se." Pl.'s Summ. J. Resp. 11. Quintana posits that because FNAC's EEO and anti-discrimination policies were effective April 1, 2010, "minorities would be expected to be only recent hires." *Id.* As FNAC correctly argues, this assertion is sheer "specula[tion]" and unaccompanied by any proof of "FNAC's hiring history of minorities before or after 2010." Def.'s Reply 5.

As there is no direct evidence of discrimination, the court turns to the three-part *McDonnell Douglas* analysis to determine whether Quintana has offered sufficient evidence of employment discrimination to survive summary judgment.

### 2.     *McDonnel Douglas* - Circumstantial Evidence

#### a.     Prima Facie Case

The court now considers whether Quintana can make out a prima facie case of age or race discrimination.[5] In a RIF case alleging intentional discrimination based on a age, race, or national origin, a plaintiff makes out a prima facie case by showing: (1) that he is within the protected group; (2) that he has been adversely affected by the employer's decision; (3) that he was qualified to

---

[5] Although Quintana pleads a case for national origin discrimination, in his legal briefing he does not distinguish it from his claim for race discrimination. The court will therefore consider the two together under the "race" rubric. *See, e.g., Siddiqui*, 731 F. Supp. 2d at 648 n.14.

assume another position at the time of the discharge; and (4) "evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." *Stewart v. Sanmina Tex., L.P.*, 156 S.W.3d 198, 209 (Tex. App.—Dallas 2005, no pet.) (quoting *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996)); *Russo v. Smith Int'l, Inc.*, 93 S.W.3d 428, 435 (Tex. App.—Houston [14th Dist] 2002, pet. denied (same); *see also Peterson v. Bell Helicopter Textron, Inc.*, 901 F. Supp. 2d 846, 854 (N.D. Tex. 2012); *Coreas v. L-3 Commc'ns Corp.*, 2012 WL 2959347, at *5 (N.D. Tex. Jul. 20, 2012); *Lohn v. Morgan Stanley DW, Inc.*, 652 F. Supp. 2d 812, 832 (S.D. Tex. 2009). "In cases involving a RIF where the plaintiff has not been replaced, the fourth element of the prima facie case can be established by evidence that members outside the protected class remained in similar positions after the RIF.*" Hall v. Sealy, Inc.*, 2011 WL 4389701, at *4 (N.D. Tex. Sept. 21, 2011) (Fitzwater, C.J.) (and cases cited therein); *Amburgey v. Corhart Refractories Corp*., 936 F.2d 805, 812 (5th Cir. 1991); *Coreas*, 2012 WL 2959347, at *5.

There is no dispute regarding the first three elements of the prima facie case. The court therefore considers whether Quintana has offered sufficient evidence to satisfy the fourth element of his prima facie case.[6]

### i.    Age

With regard to his age discrimination claim, Quintana argues he has satisfied the fourth element of his prima facie case since FNAC retained Nordman, who is younger than Quintana. Pl.'s Summ. J. Resp. 8. At the time of the RIF, Quintana was fifty-four years old, and Nordman was fifty-one years old. Def.'s App. 2, 118, 121, 122.

---

[6] In its brief, Defendant cites and applies the elements of a prima facie case of discrimination for a non-RIF case, although its stated legitimate, nondiscriminatory reason for Quintana's termination is a RIF. Thus, many of Defendant's arguments are not on point. *See* Def.'s Summ. J. Mem. 15.

As FNAC's brief misstates the prima facie elements for a employment discrimination claim arising from a RIF (where plaintiff was not replaced), the court has conducted independent research on this question.   Based on its research, the court concludes that the three-year disparity in age between Nordman (fifty-one) and Quintana (fifty-four) is insufficient and does not rise to the level of  circumstantial evidence from which a factfinder might reasonably conclude that the employer intended to discriminate based on age in terminating Quintana.  *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312-13 (1996).  In *O'Connor*, the Court rejected the Fourth Circuit Court of Appeal's holding that an ADEA plaintiff had not set out a prima facie case without proof that he was replaced by someone outside the protected class, that is, younger than forty.  *Id.*  The Court held that there was no basis for such a requirement under the statute, which banned discrimination against employees because of their age.  *Id.* at 312 ("The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he lost out *because of his age*.") (original emphasis).  The Court concluded that an inference of age discrimination "cannot be drawn from the replacement of one worker with another worker *insignificantly younger*."  *Id.* at 313 (emphasis added).  Like many other courts, this court finds the reasoning in *O'Connor* is not limited to age discrimination claims where one employee is replaced by another, but also instructive in a RIF case, where the terminated employee is not replaced.  *See, e.g., Bleiweiss v. Pansuit Sales Corp.*, 2015 WL 163819, at *5 (S.D. Tex. Jan. 13, 2015); *Hall*, 2011 WL 43897701, at *4; *Mission Consol.*, 372 S.W.3d at 641; *see also Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321 (7th Cir. 2003) (quoting *O'Connor*, 517 U.S. at 312) (under ADEA, plaintiff who shows that someone "substantially younger" was retained instead of the plaintiff need not prove the retained employee was outside the class).

The court's conclusion that a three-year age different is too insubstantial to establish a prima facie case is further supported by other court's decisions. The Fifth Circuit has stated that a five-year age difference is a "close question." *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1506 (5th Cir. 1988); *Hall*, 2011 WL 4389701, at *5 (citation omitted). Other courts have held that an age difference of less than five years between an employee and his replacement is insufficient as a matter of law to create an inference of discrimination. *Bleiweiss*, 2015 WL 163819, at *5 (collecting cases); *see also Cannon v. St. Paul Fire & Marine Ins. Co.*, 2005 WL 1107372, at *4 (N.D. Tex. May 6, 2005) (Godbey, J.) (quoting *Bush v. Dictaphone Corp.*, 161 F.3d 363, 368 (6th Cir. 1998) ("[N]o reasonable jury could find that Bush's 41 year old replacement was 'substantially younger' than Bush (then 46 years old).")). Further, one appellate court has interpreted *O'Connor* as "seemingly reject[ing] a three-year age difference (a 68-year old replaced by a 65-year old). *See Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 892 (7th Cir. 1997).

In sum, the court concludes that the three-year age difference between Quintana and Nordman is insufficient on the record before the court. Absent other evidence, the court concludes that Quintana has failed to state a prima facie case of age discrimination, and FNAC's Motion for Summary Judgment should be granted.[7] Even were the court to assume, arguendo, that Quintana had stated a prima facie case, for the reasons stated below in the court's discussion of step three in the *McDonnell Douglas* burden-shifting analysis, FNAC would still be entitled to summary judgment on Quintana's age discrimination claim.

---

[7] This prima facie element can be satisfied by evidence that members outside the protected class remained in similar positions after the RIF. *See Hall*, 2011 WL 4389701, at *4. Quintana cannot rely on this showing since Nordman was fifty-one years old at the time of the RIF, and therefore within the protected class (age forty and older).

### ii.   *Race*

To reiterate, there is no dispute regarding the first three elements of the prima facie case. The court concludes that Quintana has satisfied the fourth element of his prima facie case with regard to race discrimination.  Specifically, the evidence shows that Nordman, who was white, was retained during the RIF, while Quintana, a Hispanic, was terminated.  This showing is sufficient to satisfy the fourth element of Quintana's prima facie case.  *See, e.g., Hall*, 2011 WL 4389701, at *4 ("In cases involving a RIF where the plaintiff has not been replaced, the fourth element of the prima facie case can be established by evidence that members outside the protected class remained in similar positions after the RIF."); *Coreas*, 2012 WL 2959347, at *5 (same).

### b.      Legitimate, Nondiscriminatory Reason

A RIF is presumptively a legitimate, nondiscriminatory reason for a discharge.  *Texas Instruments*, 100 F.3d at 1181; *Tucker v. SAS Inst., Inc.*, 462 F. Supp. 2d 715, 727 (N.D. Tex. 2006); *Russo*, 93 S.W.3d at 438.  FNAC has satisfied its burden of production that it terminated Quintana as part of a RIF.  *See* Def.'s App. 3, 118, 120-21.

### c.      Pretext and Mixed-Motives Analysis

The court now turns to whether Quintana has introduced evidence that would enable a reasonable trier of fact to find that age or race was a motivating factor for FNAC's decision to include him in the RIF.  *See generally Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001) (stating that the "motivating factor" causation standard applies to all claims brought under TCHRA-those based on pretext and mixed motives theories alike); *Reed*, 701 F.3d at 440.

Quintana can avoid summary judgment on his age and race claims by showing that age or race was a "motivating factor" in FNAC's termination decision. "Under the TCHRA, [Quintana] can do so by showing 'either (1) the reason stated by the employer was a pretext for discrimination, or

(2) the defendant's reason, while true, was only one reason for its conduct and discrimination is another motivating factor[.]'" *Reed*, 701 F.3d at 439-40 (quoting *Michael*, 314 S.W.3d at 691).

### i.    Age

In an attempt to create a genuine dispute of material fact that age was a motivating factor in FNAC's decision to terminate him as part of the RIF, Quintana relies on Peterson's May 2, 2012 remark, and on the three-year age disparity between him and Nordman.   As already stated by the court in its discussion of the lack of direct evidence, Peterson's comment that the sales group "looked like a bunch of graying old men, white men[,]" Pl.'s Summ. J. Resp. 16, if anything, suggests on its face that FNAC actually favors older employees, rather than discriminates against them in favor of younger workers.   Nothing about this statement can be interpreted as a discriminatory comment based on age.  Further, as the court already noted, because Nordman is not "substantially younger" than Quintana, evidence that Nordman was retained during the RIF is insufficient to create an inference of age discrimination.  *See O'Connor*, 517 U.S. at 312-13.  As Quintana provides no other evidence to support his argument that age was a motivating factor in FNAC's RIF decision, FNAC's Motion for Summary Judgment on Quintana's age discrimination claims will be granted.

### ii.    Race

Quintana relies on several different types of evidence, and advances various arguments, in an attempt to avoid summary judgment on his race discrimination claim.  The court will examine each in turn.

First, Quintana argues that statistical evidence demonstrates pretext.  Pl.'s Summ. J. Resp. 12.  While Quintana is correct that statistics may be relevant to a showing of pretext, *see McDonnell Douglas*, 411 U.S. at 804-05, the statistical evidence in this case is not susceptible to the

interpretation Quintana seeks to ascribe to it.   Quintana relies on the statistic that "[a]s a result of the RIF, *100 % of the minorities* on Peterson's team, the 2 Hispanics, were fired, leaving the team totally without diversity." Pl.'s Summ. J. Resp. 10 (original emphasis).   In response, FNAC argues that Quintana's "appeal to statistical evidence to show discrimination is misplaced because the sample he relies on is too small to form the basis of any statistical analysis and he does not provide any context to relate the 'data' to other competent evidence that could support a reasonable inference that improper motives influenced the layoff decisions." Def.'s Reply 10-11.   The court agrees.

"The probative value of statistical evidence ultimately depends on all the surrounding facts, circumstances, and other evidence of discrimination." *Texas Instruments*, 100 F.3d at 1185; *see also Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1288 (5th Cir. 1994) ("Whether or not a sample is too small to yield statistically meaningful results [] must be determined on a case-by-case basis."). Quintana's statistic that the RIF resulted in termination of the only two minorities on Peterson's team, without more, does not permit a reasonable inference that race was a motivating factor in Quintana's termination.   Notably, Quitnana's evidence fails to take into account that Galindo, the only other Hispanic, had the least tenure in the Los Angeles area group, or that Nordman had twenty years of employment as compared to Quintana's six years.   Further, Quintana fails to provide the court with any data regarding the remaining eighteen employees in Peterson's group, including how long each had been employed, in which geographical area each worked, or the economic conditions in each area.   Finally, of the nine employees in total terminated during the RIF, other than the race of himself and Galindo, Quintana provides no statistics.   The court concludes that Quintana's statistics are not probative of discriminatory intent because the sample is too small, and "because they are devoid of context." *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 583 (5th Cir. 2006).

**Memorandum Opinion and Order - Page 19**

Next, Quintana points to his performance history and argues that lower performing employees should have been selected over him.  He further posits that FNAC's reliance on tenure, rather than performance, draws into question the veracity of an economic justification for the RIF. That Quintana disagrees with FNAC's business decision to choose tenure, rather than performance, as a selection criterion for the RIF, is not evidence sufficient to raise a genuine dispute of material fact that race motivated FNAC's decision.  *See Jackson v. Watkins*, 619 F.3d 463, 468 (5th Cir. 2010) ("But it is not our place to second-guess the business decision of an employer, as long as those decisions are not the result of discrimination."); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) ("The question is not whether an employer makes an erroneous decision; it is whether the decision was made with discriminatory motive.").[8]

Further, Quintana argues that FNAC's use of tenure as a selection criteria in the RIF is not worthy of credence since another sales employee who worked in flatbed sales had shorter tenure than he, but was not eliminated during the RIF.  That another employee had less tenure and was retained ignores the criteria used by FNAC.  As Prutting states in his Declaration: "[T]he employees selected for the [RIF] were chosen based on their location, business function, duplicative or redundant job position and tenure."  Def.'s App. 3.  To accept Quintana's argument would require the court to recast the RIF as pertaining to the entirety of FNAC's workforce, rather than just the Commercial Graphics unit (of which Digital Solutions was a part).

Seeking to raise a genuine dispute of material fact that FNAC's termination decision was a pretext for race discrimination, Quintana argues that FNAC's evidence shows shifting reasons for

---

[8] In a RIF case, a plaintiff can prove pretext by introducing evidence that he "was clearly better qualified than younger employees who were retained."  *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 123 (5th Cir. 1992) (internal quotation marks omitted).  Quintana has failed to produce evidence that would enable a reasonable juror to find that he was "clearly better qualified" than any younger retained employees.

**Memorandum Opinion and Order - Page 20**

the RIF.  The court has reviewed the evidence in the light most favorable to Quintana, including the declarations of Prutting, Sowold, and Zimmerman (Def.'s App. 3, 118, 120-21), and concludes that the evidence does not support Quintana's argument, and that the reasons articulated for the RIF are wholly consistent.

Quintana also argues that Peterson's May 2, 2012 comment to him that the sales group "looked like a bunch of graying old men, white men[,]" is evidence that race was a motivating factor in his termination.  *See* Pl.'s Summ. J. Resp. 16.  Statements may be used to demonstrate pretext when they "first, demonstrate discriminatory animus and, second [are] made by a person primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decisionmaker."  *Laxton v. Gap Inc.*, 333 F.3d 572, 583 (5th Cir. 2003) (citing *Sandstad*, 309 F.3d at 899; *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000)).  Here, the court concludes that this comment does not demonstrate discriminatory animus; rather, it is an observation about workplace diversity.  In any event, Quintana has not presented evidence that Peterson was responsible for the decision to terminate him, or in a position of influence or leverage over Zimmerman and Sowold, the decisionmakers.

As further evidence of disparate treatment, Quintana complains about: a territory realignment that resulted in an inferior sales territory (Pl.'s App. 16); commission disputes where he was ultimately paid (*id.* at 21); a letter from Sowold requiring involvement of account managers in sales after Quintana sold a large digital press to a customer without keeping Sowold advised so that the Company could also sell customer consumable products (*id.* at 27); the lack of sales calls with Sowold and Peterson even though they made sales calls with Nordman (*id.* at 33); and comments by Sowold on Quintana's 2011 performance evaluation where, although Quintana received the highest rating, Sowold wrote a comment that he did not agree with Quintana's rating (*id.* at 69, 109-

10).  As to these purported acts of disparate treatment based on race, other than his own speculation and subjective belief, Quintana fails to provide the court with evidence that these events were the result of discriminatory animus.  Speculation that these events were motivated in whole, or in part, by racial discrimination, is insufficient to raise a genuine dispute of material fact that racial discrimination was a motivating factor in FNAC's decision to terminate Quintana as part of the RIF.  *See Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (quoting *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc) ("This Court has cautioned that 'conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy' the nonmovant's burden in a motion for summary judgment.")); *see also M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 25 (2000) ("Subjective beliefs are insufficient to overcome [employer's] summary judgment evidence.") (citations omitted).

In sum, Quintana has failed to raise a genuine dispute of material fact that FNAC's RIF in Commercial Graphics (which included the Digital Solutions team), precipitated by an economic downturn, was a pretextual reason for his termination (and unlawful age or race discrimination was the real reason), or that unlawful discrimination based on age or race was a motivating factor for his termination. Accordingly, FNAC's Motion for Summary Judgment on Quintana's age and race discrimination claims will be granted.

### B.    Retaliation Claim

Defendant also moves for summary judgment on Quintana's claim for retaliation.  The TCHRA prohibits an employer from retaliating against an employee for engaging in certain protected activities.  Tex. Lab. Code § 21.005.  Protected activities consist of: (1) opposing a discriminatory practice; (2) making or filing a charge; (3) filing a complaint; or (4) testifying, assisting, or participating in any manner of investigation, proceeding, or hearing.  *Id.*; *Anderson v.*

*Houston Cmty. Coll. Sys.*, __ S.W.3d __, 2015 WL 174233, at *8 (Tex. App.— Houston [1st Dist.] Jan. 13, 2015).  Similar to discrimination, when there is no direct evidence of retaliation, the three-step burden-shifting analysis is applied in determining a motion for summary judgment.  *McDonnell Douglas*, 411 U.S. at 802.  To prevail in a retaliation case under this section, the employee must first establish a prima facie showing that: (1) he engaged in a protected activity; (2) he experienced an adverse employment action following the protected activity; and (3) a causal link existed between the protected activity and the adverse employment action.  *Mayberry v. Texas Dep't of Agric.*, 948 S.W.2d 312, 315 (Tex. App.—1997, writ denied); *see also Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001)*; Mota v. University of Texas Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001). The establishment of a prima facie case gives rise to an inference of retaliation. *Montemayor,* 276 F.3d at 692*.*  This inference, in turn, shifts the burden of proof to the employer, who must then articulate a legitimate, nonretaliatory reason for the challenged employment action. *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).  Once a defendant asserts such a reason, the inference of discrimination or retaliation raised by the prima facie showing drops from the case.  *Montemayor,* 276 F.3d at 692.  At this point, summary judgment is appropriate unless the plaintiff raises a genuine dispute of material fact that the defendant's rationale is pretextual. *McDonnell Douglas*, 411 U.S. at 801-03.

In support of summary judgment, FNAC argues that Quintana has failed to establish the first and third elements of a prima facie case of retaliation.  Specifically, FNAC contends that Quintana fails to show he engaged in any protected activity, and that "even if Quintana could demonstrate that he engaged in protected activity, he has no evidence to establish a causal connection between his alleged protected activity and his discharge."  Def.'s Summ. J. Mem. 21.   In response, Quintana contends that he has satisfied the elements of his prima facie case.  To establish the first element,

he argues he opposed a discriminatory practice since "his complaints of discrimination and harassment to Ron Peterson, his direct supervisor, during the Austin sales calls on May 2, 2012," constitute protected activity.  Pl.'s Summ. J. Resp. 20.  To satisfy the third element, Quintana argues that "[c]ausation is shown by the close temporal proximity between Plaintiff's complaints and his termination, in addition to the other circumstances documented herein."  *Id.* at 22.

With regard to protected activity, and specifically the clause that renders as protected activity "opposing any discriminatory practice," the Supreme Court has held that "opposed," left undefined by statute, "carries its ordinary meaning[,]" which includes "'to resist or antagonize; to contend against; to confront; resist; withstand'" or "to be hostile or adverse to, as in opinion." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) (alteration and citations omitted). It is uncontroverted that Quintana never complained about discrimination or harassment to the Company.  Quintana testified at his deposition that during his approximately six years of employment he did not complain about age, race, or national origin discrimination or harassment to the Human Resources Department, management, or anyone else designated to receive complaints. Def.'s App. 105-06. Sowold, Zimmerman, and Prutting have provided uncontroverted evidence that during Quintana's employment with FNAC, he never complained to them, or to Human Resources, that he was being discriminated against based on his age, race, or national origin. *Id.* at 4, 40, 118, 121.  While the record shows Quintana complained about discrimination after his termination (Pl.'s App. 100-01), "[i]t is self-evident that alleged adverse employment actions that occurred prior to the protected activity cannot serve as the basis for a claim of retaliation." *Correas*, 2012 WL 2959347, at *10 (and cases cited therein).

Further, the court rejects Quintana's argument that his conversation with Peterson on May 2, 2012, regarding lack of diversity on the sales team constitutes protected activity.  The court has

examined Quintana's deposition testimony concerning the conversation, and agrees with FNAC that Quintana's conversation with Peterson regarding lack of diversity cannot be deemed protected activity "because Quintana did not oppose an unlawful discriminatory practice, but, rather, he allegedly merely commented that he noticed a lack of diversity in the sales force." Def.'s Summ. J. Mem. 20.

Even were the court to find that Quintana had satisfied the first prong of his prima facie case, the court nevertheless concludes that Quintana has failed to establish the third prong of his prima facie case, a causal link between the alleged protected activity and the adverse employment action. A "causal link" exists when "the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001) (internal punctuation and citation omitted). Thus, to demonstrate the required causal link required for a prima facie case, a plaintiff need not prove that his protected activity was the sole factor motivating the employment decision. *See Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996).

To establish a causal link, Quintana relies solely on the temporal proximity between his May 2, 2012 conversation with Peterson and the June 5, 2012 announcement that he would be terminated as part of the RIF.[9] At the prima facie stage, "temporal proximity can only establish the causal link when it is connected to the decisionmaker's knowledge of the protected activity." *Thomson v. Somervell Cnty., Tex.*, 431 F. App'x 338, 342 (5th Cir. Jul. 1, 2011) (and cases cited therein); *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) ("The cases that accept mere

---

[9] In addition to temporal proximity, Quintana points to "other circumstances documented herein[]" to respond to FNAC's argument that it is entitled to summary judgment because no causal link has been shown. Pl.'s Summ. J. Resp. 22. Absent citation to the summary judgment record, this vague reference to the record is insufficient to establish a prima facie case. *See Ragas*, 136 F.3d at 458 (Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment).

temporal proximity between *an employer's knowledge of protected activity* and an adverse

employment action as sufficient evidence of causality to establish a prima facie case uniformly hold

that temporal proximity must be very close.") (emphasis added); *see also Brungart v. BellSouth*

*Telecommc'ns, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("[T]emporal proximity alone is insufficient

to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the

decision maker did not have knowledge that the employee engaged in protected conduct.").

In this case, Quintana has failed to provide any evidence that Peterson was involved in

selecting him as part of the RIF, or any evidence to controvert FNAC's summary judgment evidence

that the decisionmakers in the RIF selection process (Zimmerman and Sowold) had no knowledge

of any complaint Quintana may have made to Peterson, any complaint about lack of diversity, or any

knowledge that Quintana engaged in any protected activity.  Def.'s App. 105-06, 118, 121, 36.

Absent evidence that Sowold or Zimmerman was aware of Quintana's alleged protected activity,

Quintana has failed to satisfy the third element of his prima facie case.  *See generally Ackel v.*

*National Commc'ns Inc.*, 339 F.3d 376, 385-86 (5th Cir. 2003) (granting summary judgment in favor

of employer on retaliation claim where employee had no evidence that decisionmaker was aware

of protected activity); *Medina*, 238 F.3d at 684 ("A 'causal link' is established when the evidence

demonstrates that the employer's decision to terminate was [based] in part on knowledge of the

employee's protected activity."); *Marsaglia v. University of Texas, El Paso*, 22 S.W.3d 1, 5 (Tex.

App.—El Paso 1999, pet. denied) (affirming summary judgment where plaintiff failed to produce

evidence that decisionmaker had knowledge of her protected activity).

Quintana has failed to meet his burden of establishing that he engaged in protected activity.

Further, even were the court to conclude that Quintana's May 2, 2012 comments to Peterson

constituted protected activity, Quintana has failed to establish a prima facie causal link between his

comments to Peterson and his termination.   Accordingly, Defendant's Motion for Summary

Judgment on Quintana's retaliation claim will be granted.[10]

### C.      Harassment/Hostile Work Environment

In his Original Petition, Quintana alleges in conclusory fashion that the discrimination

against him "included harassment and a hostile work environment based upon Plaintiff's age, race

and national origin."   Orig. Pet. ¶ 3.07.   In his response to Defendant's Motion for Summary

Judgment, Plaintiff limits his claim to race and/or age. Pl.'s Summ. J. Resp. 18. The court concludes

that Quintana has abandoned any harassment or hostile work environment claims based on national

origin, and the court will therefore confine its analysis to race and age.   Even if the court were to

consider national origin, it would reach the same result it reaches on the age and race claims.

A hostile work environment claim "entails ongoing harassment, based on the plaintiff's

protected characteristic, so sufficiently severe or pervasive that it has altered the conditions of

employment and creates an abusive working environment."   *Bartosh v. Sam Houston State Univ.*,

259 S.W.3d 317, 324 (Tex. App.—Texarkana, 2008, pet. denied) (citing *Meritor Savs. Bank, FSB*

*v. Vinson*, 477 U.S. 57, 67 (1986)).   Ordinarily, to establish a *prima facie* case of hostile work

environment, an employee must raise a genuine dispute of material fact or prove: (1) that he belongs

to a protected class; (2) he was subject to unwelcome harassment; (3) the harassment complained

of was based on the protected characteristic; (4) the harassment complained of affected a term,

condition, or privilege of employment; and (5) the employer knew or should have known of the

harassment and failed to take prompt remedial action.   *Ramsey*, 286 F.3d at 268; *Hernandez v.*

*Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (Title VII and Chapter 21). In *Faragher v.*

---

[10] Because the court determines that Quintana cannot establish a prima facie case of retaliation, the court does not address the subsequent steps in the *McDonnell Douglas* framework.

*City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742

(1998), the Supreme Court modified this test with respect to cases in which the alleged harasser is

a supervisor with immediate or higher authority over the harassed employee.  In such cases, the

employee need only meet the first four elements of the test. *See id.*

The fourth element of the test is met only if the harassment was "sufficiently severe or

pervasive so as to alter the conditions of employment and create an abusive working environment."

*Ramsey*, 286 F.3d at 268 (citations omitted).  If the conduct at issue was not severe or pervasive, the

employer cannot be held vicariously liable for the supervisor's actions. *Wyatt v. Hunt Plywood Co.*,

297 F.3d 405, 409 (5th Cir. 2002).  To be actionable, the work environment must be "both

objectively and subjectively offensive, one that a reasonable person would find hostile or abusive,

and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787 (citation omitted).

To determine whether an environment was objectively offensive, courts consider the totality of the

circumstances, including the frequency of the conduct, its severity, whether it is physically

threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with

the employee's work performance.  *Id.* at 787-88; *see also Waffle House, Inc. v. Williams*, 313

S.W.3d 796, 806 (Tex. 2010) (stating such in sexual harassment claim).

Even when a hostile environment is shown, the plaintiff must establish that the workplace

environment had the effect of altering the terms, conditions, or privileges of his employment. *Harris*

*v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 403 (5th

Cir. 1993).  "Not all harassment will affect a term, condition, or privilege of employment."

*Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999) (citation omitted).

The "mere utterance of an . . . epithet which engenders offensive feelings in a[n] employee[ ] does

not sufficiently affect the conditions of employment." *Harris*, 510 U.S. at 21 (quoting *Meritor*, 471

U.S. at 67).  Title VII's overall goal of equality is not served if a claim can be maintained solely based on conduct that wounds or offends but does not hinder an employee's performance.  *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996).

It is undisputed that Quintana belongs to a protected group as a Hispanic.  FNAC disputes the remaining elements of Quintana's hostile work environment claim.  Among other arguments, Defendant moves for summary judgment on Quintana's hostile work environment claim, arguing the absence of evidence that Quintana suffered any harassment based on age, race, or national origin, or suffered harassment that was severe or pervasive enough to create an objectively unreasonable work environment. Def.'s Summ. J. Mem. 22-29.  Defendant also argues that Quintana has failed to show that any alleged harassment hindered his job performance.  Quintana responds in conclusory fashion that he was subjected to harassment and a hostile work environment based on race and/or age. Pl.'s Summ. J. Resp. 18-20.  In his briefing, Quintana does not respond to FNAC's argument that he has failed to produce evidence showing that any harassment was sufficiently severe or pervasive.

Viewing the evidence in the light most favorable to Quintana, the court concludes that he has failed to produce evidence that the few harassing instances of which he complains over a period of more than six years of employment have any connection to his protected status.  Specifically, Quintana complains about: a territory realignment that resulted in an inferior sales territory (Pl.'s App. 16); commission disputes where he was ultimately paid (*id.* at 21); a letter from Sowold requiring involvement of account managers in sales after Quintana sold a large digital press to a customer without keeping Sowold advised so that the Company could also sell customer consumable products (*id.* at 27); the lack of sales calls with Sowold and Peterson, even though they made sales calls with Nordman (*id.* at 33); and comments by Sowold on Quintana's 2011 performance

evaluation where, although Quintana received the highest rating, Sowold wrote a comment that he did not agree with the rating (*id.* at 69, 109-10).[11]

With regard to each of these alleged instances of harassment, Quintana has failed to produce any evidence that such incidents were motivated by intentional harassment based on age or race. Further, the record shows that Quintana was never subjected to name-calling, jokes, racial slurs, or e-mails that he believed were offensive or that were based on age or race.  From this evidence, the court concludes that a reasonable jury could not find that the conduct of which Quintana complains was sufficiently hostile or abusive to create a hostile work environment based on age or race.

Finally, the court agrees with FNAC that it is entitled to summary judgment on Quintana's harassment and hostile work environment claims based on the affirmative defenses made available to the employer under *Faragher*, *supra*, and *Burlington Industries*, *supra*.  When an employer has "provided a proven, effective mechanism for reporting and resolving complaints [of harassment], available to the employee without undue risk or expense," and the plaintiff "unreasonably failed to avail [himself] of the employer's preventative or remedial apparatus . . . no liability should be found against the employer who has taken reasonable care."  *Faragher*, 524 U.S. at 807.  FNAC has adduced summary judgment evidence that it has an established, developed policy against harassment and a system for reporting such claims.  Def.'s App. 4, 5, 8, 10, 25-26, 27.  The evidence shows that Quintana was aware of these policies and protections available to him, but he did not avail himself of them.  *Id.* at 4, 40, 51-52, 105-06, 113, 114, 121.

---

[11] Deposition testimony also reflects that Quintana considered as harassment that he was not given a chance to apply for a certain position.  Def.'s App. 88.  This claim is time-barred, as the position was filled in March 2011, more than 180 days before Quintana filed his charge of discrimination.  *Id.* at 4, 11, 124.  *See* Tex. Lab. Code § 21.202(a) (making it mandatory and jurisdictional that claims under the Texas Labor Code be filed no later than 180 days after the alleged unlawful employment practice).  Additionally, Quintana failed to address this purported example of harassment in his response brief, and the court accordingly concludes Plaintiff is no longer relying on this instance to support his harassment or hostile work environment claim.

**Memorandum Opinion and Order - Page 30**

The uncontroverted summary judgment evidence establishes that Quintana unreasonably failed to take advantage of FNAC's policies to prevent or correct any harassment.  Absent knowledge of any harassment, FNAC could not have acted promptly to remedy the situation. Therefore, no liability may attach to FNAC for Quintana's harassment or hostile work environment claims.  *Faragher*, 524 U.S. at 807; *see also Giddens v. Community Educ. Ctrs., Inc.*, 540 F. App'x 381, 389 (5th Cir. 2013) (concluding that employer was entitled to *Faragher/Ellerth* affirmative defense as to plaintiff's hostile work environment claims where plaintiff failed to avail herself of the employer's anti-harassment policies).

Because Quintana has failed to establish a prima facie case of harassment or hostile work environment, there is no genuine dispute of material fact regarding these claims, and Defendant is entitled to judgment as a matter of law.  Defendant's Motion for Summary Judgment on these claims will be granted.

## III.   Conclusion

For the reasons herein stated, the court **grants** Defendant's Motion for Summary Judgment. All claims are hereby **dismissed with prejudice**.  As required, a final judgment will issue separately pursuant to Federal Rule of Civil Procedure 58.

**It is so ordered** this **30th** day of **March, 2015.**

Sam A. Lindsay
United States District Judge